UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

UNITED STATES OF AMERICA

v.                                                          1:23-cr-00103-JL-AJ

ERIC EDMONDSON

## MOTION TO DISMISS INDICTMENT

Defendant, Eric Edmondson, respectfully moves pursuant to Rule 12(b)(1) of the Federal Rules of Criminal Procedure to dismiss the Indictment in this case because it violates the Second Amendment as it applies to him.

### OVERVIEW

Mr. Edmondson has previously been convicted in the State of New Hampshire for certain felony offenses,[1] including theft by deception, receipt of stolen property, witness tampering, forgery, operation of a motor vehicle after certification as a habitual offender, and second degree assault. Mr. Edmondson has also been convicted in the Superior Court of Massachusetts of the following felonies: breaking and entering, knowingly receiving stolen property, and larceny.[2] Because of these felony convictions, federal law categorically prohibits Mr. Edmondson from possessing any firearm or ammunition in or affecting interstate commerce. *See* 18 U.S.C. § 922(g)(1). Moreover, section 922(g)(1) permanently prohibits Mr. Edmonson from possessing

---

[1]     The term "felony" is not defined in any statute relevant to this Motion. However, modern criminal codes typically define a felony as any crime punishable by up to a year or more in jail (*see e.g.*, 18 U.S.C. § 3559(a)(5)) and those convicted of a modern felony are generally referred to as "felons." For convenience, Mr. Edmondson adopts these modern labels here. However, Mr. Edmondson does not concede that he is similarly situated to any person that would have been considered a felon at the time the Second Amendment was ratified.

[2]     Mr. Edmondson has also been adjudicated guilty in the District Court for the State of Massachusetts for crimes that could qualify as felonies under federal law. However, in the experience of undersigned counsel, felonies that originate in Massachusetts District Court are sometimes elevated to Superior Court under a separate docket number—which can result in a duplicate guilty notation in a person's criminal history. Regardless, Mr. Edmondson's potential felony convictions from the District Court of Massachusetts include: larceny, breaking and entering, malicious destruction of property, and knowingly receiving stolen property.

1

these items unless his prior felony convictions have been "expunged, or set aside" or he is otherwise "pardoned or has [his] civil rights restored[.]" 18 U.S.C. § 921(a)(20).

The Indictment here alleges that on or about September 11, 2023, Mr. Edmondson, having previously been convicted of a felony, illegally possessed a 9x19mm handgun and five rounds of corresponding 9mm ammunition in violation of section 922(g)(1). (ECF No. 1). Considering the Supreme Court's recent decision in *New York Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), the Indictment should be dismissed pretrial because, on its face, it attempts to hold Mr. Edmondson criminally liable for conduct that is protected under the Second Amendment as it applies to him. *See* Fed. R. Crim. P. 12(b)(1) ("A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits").

## ARGUMENT

The Second Amendment to the United States Constitution provides that: "A well regulated Militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed." U.S. Const. Amend. II. The Supreme Court's recent decision in *Bruen* articulated a specific analytical framework that courts must apply when a firearm regulation is challenged under the Second Amendment. *See Bruen*, 597 U.S. at 17-24. Under *Bruen*, courts must first decide whether "the Second Amendment's plain text covers an individual's [regulated] conduct" because if so, "the Constitution presumptively protects that conduct." *Id*. at 24. Second, if Congress regulates conduct presumptively protected under the Second Amendment, the burden falls on the government to "affirmatively prove that its firearms regulation is part of the [nation's] historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19. Only *after* the government demonstrates that its regulation "is consistent with the Nation's

historical tradition of firearm regulation" may the court "conclude that the individual's [regulated] conduct falls outside the [scope of the] Second Amendment[.]" *Id*. at 24.

*Bruen* has triggered a "rapidly developing issue of law." *United States v. Thompson*, 62 F.4th 37, 43 (1st Cir. 2023) (citations and quotations omitted). However, although *Bruen* itself presents novel questions for courts, the crux of this Motion to Dismiss remains straightforward: Mr. Edmondson has an individual right under the Second Amendment to possess firearms and ammunition that are commonly used for self-defense and prosecuting him under section 922(g)(1) for being a felon in possession of these items burdens that right in a manner inconsistent with our nation's history of regulating firearms. Because of this, the Indictment should be dismissed because it attempts to impose criminal liability on Mr. Edmondson for conduct that is protected under the Second Amendment as it applies to him. Mr. Edmondson will address each of these matters in turn.

1. **Mr. Edmondson's possession of a handgun is presumptively protected under the Second Amendment.**

The "central component" of the Second Amendment protects an individual right to possess firearms commonly used for self-defense. *See e.g.*, *Bruen*, 597 U.S. at 29; *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 767-68 (2010); *District of Columbia v. Heller*, 554 U.S. 570, 628-30 (2008). Thus, "[t]he Second Amendment guarantee[s] to 'all Americans' the right to bear *commonly used* arms in public subject to certain reasonable, well-defined restrictions." *Bruen*, 597 U.S. at 70 (citing *Heller*, 554 U.S. at 581) (emphasis added). The Supreme Court has specifically recognized that "handguns are the most popular weapon chosen by Americans for self-defense[.]" *Heller*, 554 U.S. at 629. Accordingly, it is beyond dispute that a law which categorically prohibits a person from possessing a handgun regulates conduct presumptively protected under the Second

Amendment. *See Heller*, 554 U.S. at 629 (holding that "a complete prohibition of [the] use of [handguns] is invalid").

The only difference between section 922(g)(1) and a categorical ban on handgun possession is that section 922(g)(1) categorically prohibits handgun possession by *modern felons*. Thus, when applying *Bruen's* threshold analysis to Mr. Edmondson's Indictment, the only relevant question is whether the "plain text" of the Second Amendment justifies categorically excluding modern felons from the otherwise unqualified right to possess a handgun. *See Bruen*, 597 U.S. at 17, 24, 32, 33. (limiting the threshold analysis to the "plain text of the Second Amendment).

### a.  Modern felons are among "the people" protected by the plain text of the Second Amendment.

The Second Amendment grants a right to bear arms to "the people" without qualification. *See* U.S. Const. Amend. II. Thus, nothing in the "plain text" of the Amendment justifies categorically excluding modern felons from the individual right to possess a handgun. *Cf. Heller*, 554 U.S. at 581 ("We start therefore with the strong presumption that the Second Amendment right is exercised individually and belongs to all Americans"). Any argument that "the people" was meant to categorically exclude certain unmentioned groups would require a court to consider sources external to the Second Amendment itself, which is properly left to *Bruen's* historical inquiry under step-two.

Additionally, this plain reading of "the people" would also be consistent with similar language found throughout the Constitution. As the Supreme Court recognized in *Heller*, every other provision of the Constitution which refers to "'the people' . . . unambiguously refers to all members of the political community, not an unspecified subset[.]" *See Heller*, 544 U.S. at 580. For example, "the people" have the right to "peaceably . . . assemble, and to petition the government for a redress of grievances." U.S. Const. Amend. I. "[T]he people" also have the right

"to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. Amend. IV. Finally, the Constitution's enumeration of rights "shall not be construed to deny or disparage others retained by the people" and any power "not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." *Compare* U.S. Const. Amend. IX, *with* U.S. Const. Amend. X.

Based on the foregoing, "the people" protected by the plain text of the Second Amendment is unqualified and applies equally to all Americans, including modern felons. *See e.g.*, *Range v. Att'y Gen. of the United States of Am.*, 69 F.4th 96, 102 (3rd Cir. 2023) (en banc) (holding that "[u]nless the meaning of the phrase 'the people' varies from provision to provision—and the Supreme Court in *Heller* suggested it does not—to conclude that [modern felons are] not among 'the people' for Second Amendment purposes would exclude [them] from [the First, Fourth, Ninth and Tenth Amendment] rights as well"). Accordingly, Mr. Edmondson is among "the people" protected by the plain text of the Second Amendment and is therefore presumptively entitled to possess a common handgun.

As it has done in every *Bruen* case cited *passim*, the government will likely argue that, despite the plain text of the Second Amendment, dicta from *Bruen* and *Heller* limits the Second Amendment to protect only law-abiding, responsible citizens. Mr. Edmondson acknowledges that the Supreme Court in *Heller* stated that the Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense[.]" *Heller*, 544 U.S. at 635; *see also Bruen*, 597 U.S. at 26. However, neither *Heller* nor *Bruen* actually considered whether categorically disarming felons is rooted in our nation's history of regulating firearms. *Cf. Kanter v. Barr*, 919 F.3d 437, 445 (7th Cir. 2019) (holding that the Supreme Court "never actually addressed the historical pedigree of felon dispossession laws"). Additionally, multiple authorities,

including at least two other Circuits, Justice Barrett (sitting as a Circuit Judge), and several inferior courts, have rejected that this language justifies categorically excluding certain groups from "the people" protected by the plain text of the Second Amendment. *See e.g.*, *Range*, 69 F.4th at 101 (en banc) (recognizing that "the criminal histories of the plaintiffs in *Heller*, *McDonald*, and *Bruen* were not at issue" and "their references to 'law-abiding, responsible citizens' were dicta") (quotations omitted); *Kanter*, 919 F.3d at 453 (Barrett, J., dissenting) (observing that *Heller* "interpreted the word 'people' as referring to all Americans" and that "felons . . . are [not] categorically excluded from our national community") (internal citations and quotations omitted); *United States v. Meza-Rodriguez*, 798 F.3d 664, 669 (7th Cir. 2015) (noting its "reluctan[ce] to place more weight" on *Heller's* "passing references" to law-abiding citizens and finding that "[o]ther language in *Heller* supports . . . that all people . . . enjoy at least some rights under the Second Amendment"); *see also United States v. Prince*, Case No. 22-cr-240, 2023 WL 7220127, *2 (N.D. Ill. Nov. 2, 2023); *United States v. Bullock*, 3:18-cr-165-CWR-JKB, 2023 WL 4232309, *21 (S.D. Miss. June 28, 2023).

Ultimately, *Bruen* consistently stated that step-one of its analysis is governed by the "plain text" of the Second Amendment (*See Bruen*, 597 U.S. at 17, 24, 32, 33) and neither *Heller* nor *Bruen* performed any historical analysis of felon dispossession laws. Therefore, relying on *Heller* and *Bruen* in the manner the government is likely to suggest would improperly subvert the "plain text" of the Second Amendment with dicta that has not been tested against our nation's history of regulating firearms. *Cf. Bruen*, 597 U.S. at 36 (holding that "to the extent later history contradicts what the text [of the Second Amendment] says, the text controls").

Accordingly, section 922(g)(1) regulates conduct presumptively protected by the plain text of the Second Amendment because it prohibits Mr. Edmondson from possessing a common handgun based solely on his status as a modern felon.

### b. Prohibiting Mr. Edmondson from possessing a handgun is inconsistent with the nation's history and tradition of regulating firearms.

Because section 922(g)(1) regulates conduct presumptively protected under the Second Amendment, *Bruen* requires that the government "affirmatively prove" that permanently prohibiting Mr. Edmondson from possessing any handgun is consistent with the nation's history and tradition of regulating firearms. *See Bruen*, 597 U.S. at 19. *Bruen* provides two avenues for historical inquiry. *See id.* at 26-27. The first avenue is a "straightforward historical inquiry," which applies when "a challenged regulation addresses a general societal problem that has persisted since the 18th century." *Id.* Under this inquiry, the government must present a "distinctly similar historical regulation addressing that problem." *Id.* The second avenue of inquiry, discussed *infra*, is by "analogy." *See Bruen*, 597 U.S. at 28.

*Bruen's* straightforward historical inquiry is inapplicable here. The First Circuit has already held that "section 922(g)(1) is firmly rooted in the twentieth century and likely bears little resemblance to the laws in effect at the time the Second Amendment was ratified." *United States v. Booker*, 644 F.3d 12, 24 (1st Cir. 2011). Accordingly, binding First Circuit precedent squarely forecloses any argument that section 922(g)(1) regulates a societal problem that has persisted since the 18th century. The government must therefore carry its burden under *Bruen* through historical analogy.

To satisfy *Bruen's* historical analogy requirement, the government must present a historical regulation that is "relevantly similar" to the "distinctly modern" regulation at issue (*i.e.*, section 922(g)(1)). *Bruen*, 597 U.S. at 28. Then, the court must determine whether that historical

regulation "impose[s] a comparable burden on the right of armed self-defense and whether that burden is comparably justified[.]" *Id*. at 29. Although *Bruen* did not provide "an exhaustive survey of the features that render regulations relatively similar under the Second Amendment[,]" it did identify both "how and why" as specific metrics courts should consider. *Id*.

There is currently a circuit split regarding whether section 922(g)(1) is justified by the nation's history of regulating firearms. In *United States v. Jackson*, 69 F.4th 495, 505-06 (8th Cir. 2023) for example, the Eighth Circuit upheld section 922(g)(1) on the grounds that Congress could traditionally "prohibit possession of firearms by persons who have demonstrated disrespect for legal norms of society."[3] *Id*. at 504. However, in *Range,* cited *supra*, the en banc Third Circuit held that section 922(g)(1) was unconstitutional as applied because the government could not prove that "lifetime disarmament" of modern felons is "rooted in our Nation's history and tradition." *Range*, 69 F.4th at 98, 105 (en banc).[4] Additionally, neither the First Circuit nor the District of New Hampshire have published any as-applied Second Amendment decision post-*Bruen*,[5] and other district courts have reached different conclusions regarding the constitutionality of section 922(g)(1). *See generally Bullock*, 2023 WL 4232309 at *14; *Prince* 2023 WL 7220127

---

[3]      It should be noted that *Jackson* failed to articulate whether 18th century firearm prohibitions "are best characterized as restrictions on persons who deviated from legal norms or persons who presented an unacceptable risk of dangerousness[.]" *Jackson*, 96 F.4th at 507. This alone should cast considerable doubt on whether *Jackson* conducted a proper *Bruen* analysis regarding both "how *and* why" historical firearm regulations were enacted. *See Bruen*, 597 U.S. at 29.

[4]      Importantly, *Range* overturned a prior panel decision that found section 922(g)(1) constitutional. *See Range v. Att'y Gen. of the United States of Am.,* 56 F.4th 992 (3rd Cir. 2023) (vacating the panel's opinion in *Range v. Att'y Gen. of the United States of Am.*, 53 F.4th 262 (3rd Cir. 2022) (per curiam)). The Eighth Circuit's decision in *Jackson* was issued before the Third Circuit's en banc decision. *Compare Jackson*, 69 F.4th at 495 (announcing decision on June 2, 2023); *with Range*, 69 F.4th at 96 (announcing decision on June 6, 2023). However, *Jackson* cited heavily to the now overturned panel decision. *See Jackson*, 96 F.4th at 502-04. Additionally, in his brief concurrence in *Jackson*, Judge Smith held, without explanation, that *Heller* was the relevant precedent the court was bound to apply, not *Bruen*. *See id*. at 506 (Smith, J., concurring). Thus, it remains whether the Eighth Circuit would uphold the constitutionality of section 922(g)(1) under a proper *Bruen* analysis and considering the en banc decision in *Range*.

[5]      A separate court in this District denied a *facial* challenge to section 922(g)(1) brought under *Bruen*. *United States v. Brandon Dumont, et. al.*, Case No. 1:22-cr-00053-PB. The court did not issue a written decision. *See id.* at "Oral Order" (dated Nov. 14, 2022).

at *6 (both finding section 922(g)(1) unconstitutional as applied but collecting post-*Bruen* cases holding the opposite).

The legal requirements of *Bruen*, and the obvious disagreement among courts, place Mr. Edmondson in a difficult position when presenting this as-applied challenge. For one, Mr. Edmondson is challenging the constitutionality of section 922(g)(1) as it applies to him in this "particular fact situation[.]" *McGuire v. Reilly*, 386 F.3d 45, 61 (1st Cir. 2004). Thus, despite any circuit split (and the facts underlying those cases), *Bruen* still requires that the government present a historical record in this case demonstrating that prosecuting Mr. Edmondson under section 922(g)(1) is consistent with the nation's historical tradition of regulating firearms based upon the specific circumstances presented. *See Bruen*, 597 U.S. at 25 n.6. (noting the government's affirmative burden under step-two and holding that courts must resolve *Bruen's* legal questions based upon the historical record complied by the parties before it); *see also Atkinson v. Garland*, 70 F.4th 1018, 1023 (7th Cir. 2023) (holding that it could not "resolve the [*Bruen*] issue without the benefit of more substantial briefing on remand"). Mr. Edmondson cannot predict what historical regulations the government will present in response to this Motion. Thus, he is currently unable to address whether the government has met its affirmative burden to prove, as a matter of first impression in this District, that the nation's history of regulating firearms permits it to impose criminal liability on him for possessing a common handgun.

Despite the foregoing, there are a few firearm regulations from our nation's history that the government consistently presents in response to *Bruen* challenges brought under various subsections of section 922(g). Mr. Edmondson will briefly address a few of these relevant arguments, but also requests that he be allowed to supplement his arguments based on the historical record the government ultimately presents.

First, as it has done in virtually every *Bruen* case, the government will likely argue that our nation's history of categorically prohibiting certain groups from possessing firearms, such as Catholics, British loyalists, slaves, and Native Americans, provides a sufficient historical analogue to the modern practice of categorically disarming felons. However, as recognized by at least two other Circuits, this argument lacks proper context regarding *why* 18th century regulators targeted these specific groups for disarmament. *See e.g.*, *United States v. Rahimi*, 61 F.4th 443, 457 (5th Cir. 2023); *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1048 (11th Cir. 2022). In *Rahimi* for example, the Fifth Circuit recognized that early categorical gun restrictions were not designed to protect against interpersonal gun violence—as the government's overgeneralization suggests—but were instead designed to protect against groups who posed a danger of armed rebellion. *See Rahimi*, 61 F.4th at 457 (holding that "[w]hile public safety was a concern, most disarmament efforts were meant to prevent armed rebellions" and thus "*why* [18th century regulators] disarmed people [is] different" than section 922(g)(8)'s[6] "protection of an identified person from the threat of domestic gun abuse") (citations and quotations omitted). Then, in *Jimenez-Shilon*, the Eleventh Circuit held in a similar context that "an early feature of the emerging republic" was "the selective disarmament of groups associated with foreign elements." *Jimenez-Shilon*, 34 F.4th at 1048 (citations and quotations omitted). Indeed, each group the government typically identifies as being subject to categorical disarmament during the colonial period were specifically targeted because they posed an alleged danger to the sovereignty of the early nation and/or the Anglo-American rule of law.[7] *See generally United States v. Leveille*, 659 F.Supp.3d 1279, 1283, 1285 (D. N.M.

---

[6]     Similar to section 922(g)(1), section 922(g)(8) categorically prohibits firearm possession by those who have been adjudicated by any court as posing a credible threat to an intimate partner or child, or have been convicted of a misdemeanor crime of domestic abuse. *See* 18 U.S.C. § 922(g)(8).

[7]     For example, Catholics were historically prohibited from possessing firearms because the Protestant English government feared that the Catholic faith required allegiance to the Pope, rather than the crown, which posed a theoretical threat to the English Protestant rule of law. *See Kanter*, 919 F.3d at 457 (Barrett, J., dissenting); *Prince*, 2023 WL 7220127 at *6. Additionally, British loyalists were barred from firearm possession because they "were

2023) (finding that "colonial-era laws . . . tend to focus more on allegiance than on membership in a particular group" because "in the view of the legislature, providing firearms to those who have not demonstrated allegiance to this nation might put weapons in the hands of those who would do the nation harm").

New Hampshire's own history with the Second Amendment specifically demonstrates that colonial era regulators were only concerned with disarming groups which actually engaged in armed rebellion. During New Hampshire's state ratifying convention, before the Second Amendment was ratified, a majority of New Hampshire delegates voted to recommend an amendment to the Bill of Rights which stated that: "Congress shall never disarm any citizens, *unless such as are or have been in actual rebellion*." *Kanter*, 919 F.3d at 454-55 (Barrett, J., dissenting) (collecting historical sources) (emphasis in original). New Hampshire was the *only* state ratifying convention to vote in favor of incorporating a categorical firearm prohibition into what would ultimately become the Second Amendment. *See id*. at 455 (Barrett, J., dissenting). Although other state conventions *considered* more restrictive firearm amendments, such as those which applied only to "peaceable citizens" or excluded those who committed crimes or posed a "real danger of public injury[,]" those amendments were rejected. *See id*. (Barrett, J., dissenting) (citing failed proposals brought by delegates at the Massachusetts and Pennsylvania ratifying conventions). Therefore, the *only* categorical prohibition that received majority support from a state ratifying convention was New Hampshire's, which sought only to disarm individuals who engaged in *actual* rebellion—which of course is separate from those groups who posed a mere *risk*

---

actively denying the legitimacy of, and often fighting (sometimes in organized units aligned with the British Army) against, the United States." *United States v. Escobar-Temal*, No. 3:22-cr-00393, 2023 WL 4112762 (M.D. Tenn. June 21, 2023). Finally, both slaves and Native Americans were categorically denied the right to possess a firearm because it was feared that they would rebel against the dominant political community that specifically excluded them from the political society organized under the United States Constitution. *See e.g.*, *Rahimi*, 61 F.4th at 456-57; *Kanter*, 919 F.3d at 457-58 (Barrett, J., dissenting); *Prince*, 2023 WL 7220127 at *6.

of rebellion. Accordingly, New Hampshire's own history demonstrates that, when the Second Amendment was ratified, our founders did not generally approve of disarming any specific group unless and until it engaged in actual rebellion against the nation.[8]

Based on the foregoing, the nation's early history of categorical disarmament fails to provide a sufficient historical analogue to disarming felons under section 922(g)(1). *See Rahimi*, 61 F.4th at 457 (holding that our nation's history of categorical firearm prohibitions "fail on substance as analogues to section 922(g)(8), because out of the gate, *why* they disarmed people was different"). For one, categorical disarmament prior to the ratification of the Second Amendment only targeted those groups which regulators thought posed a danger of armed rebellion. *See e.g.*, *id.; Jimenez-Shilon*, 34 F.4th at 1048; *Kanter*, 919 F.3d at 457-58 (Barrett, J., dissenting); *Leveille*, 659 F.Supp.3d at 1283. Then, the only categorical firearm prohibition that received any majority support during the ratification period targeted individuals who engaged in *actual* rebellion—which is distinguished from the nation's earlier history of targeting groups who posed an alleged risk of rebellion. *See Kanter*, 919 F.3d at 454-55 (Barrett, J., dissenting). Finally, despite this history, no categorical prohibition was included in the eventual text of the Second Amendment itself. *See* U.S. Const. Amend. II. Accordingly, categorical disarmament statutes from the 18th century fail "out of the gate" to serve as a historical analogue to section 922(g)(1) because *why* colonial era regulators "disarmed [certain] people was different." *Rahimi*, 61 F.4th at 457; *see also Bruen*, 597 U.S. at 29 (identifying "how and why" as specific metrics that inform whether "regulations are relatively similar under the Second Amendment").

---

[8]     It should also be noted that even New Hampshire's limited prohibition was ultimately excluded from the Second Amendment itself. *See Kanter*, 919 F.3d at 455 (Barrett, J., dissenting) (noting that "Several things bear emphasis" under section 922(g)(1), including that "none of [New Hampshire's] relevant limiting language made its way into he Second Amendment" and "only New Hampshire's proposal—the least restrictive of the three—carried a majority of its convention"). Thus, there is sufficient grounds to suspect whether the framers of the Second Amendment intended to exclude *any* group from the right to possess a firearm.

The inadequate analogy between modern felon disarmament and our nation's early history of regulating firearms is not limited to the latter's exclusive focus on armed rebellion. When considering *Bruen's* "why" metric, this Court should also consider that at the time the Second Amendment was ratified, black people and Native Americans were specifically excluded from the body politic that was established by the United States Constitution. Without this consideration, any historical analysis of *why* colonial era regulators disarmed black people and Native Americans would be inadequate.

Beginning with black people, the Supreme Court previously held that, based on the history and traditions of our founders, black people were not considered "citizens" protected under the United States Constitution. *See Dred Scott v. Sanford*, 60 U.S. 393 (1857). Indeed, *Dred Scott* specifically held that black people "had for more than a century . . . been regarded as beings of an inferior order, and [were] altogether unfit to associate with the white race, either in social or political relations; and [were] so far inferior, that they had no rights which the white man was bound to respect[.]" *Id.* at 407. This led our founders to believe that, as a matter of law, black people could "justly and lawfully be reduced to slavery for [white society's] benefit" and "[t]his opinion was at that time fixed and universal in . . . the white race." *Id*. Therefore, at the time the Second Amendment was ratified, black people were considered so inferior to whites that they could be bought and sold as chattel, against their will, for the benefit of the nation's founders. It is therefore unsurprising that founding era regulators categorically denied black people the right to guard against forced enslavement through armed self-defense.

Our nation has a similar history regarding the legal status of Native Americans. Decades before *Dred Scott*, the Supreme Court described Native Americans as "fierce savages" that were incapable of being governed "as a distinct people" because, in part, "*they were ready to repel by*

*arms* every [European] attempt on their independence." *Johnson v. M'Intosh*, 21 U.S. 543, 590 (1823) (emphasis added). Moreover, because our European founders believed they held a "superior genius" over Native Americans, the Supreme Court held that the United States had the exclusive legal right to acquire (*i.e.*, conquer) Native lands "by the sword[.]" *Id.* at 590-91. "Frequent and bloody wars [between Native Americans and our founders] . . . ensued." *Id.*

The Supreme Court in *Heller* also recognized that the nation's history of protecting the right of armed self-defense was, at least in part, born out of Native American resistance to European conquest. *See Heller*, 554 U.S. at 609 (quoting Charles Sumner's speech about the "Bleeding Kansas" conflict, which stated that "the rifle has ever been the companion of the pioneer and, under God, his tutelary protector against the red man"). In his dissent in *Heller*, Justice Breyer also opined that "[t]wo hundred years ago, most Americans, many living on the frontier, would likely have thought of self-defense primarily in terms of outbreaks of fighting with Indian tribes[.]" *Id.* at 715 (Breyer, J., dissenting). Native American law scholars have also similarly concluded that our nation's affinity for firearms was the direct result of conflict with Native Americans. *See* Ann E. Tweedy, *Hostile Indian Tribes . . . Outlaws, Wolves, . . . Bears . . . Grizzlies and Things like That? How the Second Amendment and the Supreme Court Precedent Target Tribal Self-Defense*, 13 U. Pa. J. Const. L. 687, 698 (2011).

This history establishes that our nation's early practice of categorically disarming black people and Native Americans was the product of white supremacy—which served to protect the institution of slavery and the nation's westward expansion. *See* Robert J. Cottrol & Raymond T. Diamond, *The Second Amendment: Toward an Afro-Americanist Reconsideration*, 80 Geo. L.J. 309, 324 (1991) ("An armed white population was . . . essential to maintain social control over blacks and Indians who toiled unwillingly as slaves and servants in English settlements"). Thus,

disarming these groups cannot serve as a historical analogue to section 922(g)(1) because *why* black people and Native Americans were categorically disarmed is plainly distinguished from the modern practice of disarming felons. *See Rahimi*, 61 F.4th at 457 (holding that the laws "disarm[ing] slaves, Native Americans, and disloyal people may well have been targeted at groups excluded from the political community" and thus "[t]heir utility as historical analogues is . . . dubious at best"); *see also United States v. Griffin*, Case No. 21-cr-00693, 2023 WL 8281564, *6 (N.D. Ill. Nov. 30, 2023) (holding that "[u]nsurprisingly, this Court rejects the government's reliance on slavery and discrimination toward Native Americans as historical analogues to section 922(g)(1)" because "section 922(g)(1) is not analogous to discriminatory regulations regarding slavery and Native Americans").

Based on the foregoing, the Court should wholly exclude our nation's history of disarming black people and Native Americans from its historical analysis and focus exclusively on whether other historical analogues, not rooted in white supremacy, provide a sufficient justification for categorically disarming modern felons. *See Griffin*, 2023 WL 8281564 at *6 (holding that "[t]he Court is dismayed by the government's continuous reliance on admittedly bigoted and racists laws in [*Bruen*] cases").

Alternatively, if the Court finds that our nation's history of categorically disarming certain groups is properly analogous to disarming Mr. Edmondson as a modern felon, section 922(g)(1) is still unconstitutional under *Bruen* because it imposes a far greater burden on Mr. Edmondson's Second Amendment rights than did any historical analogue. As recognized by other courts, categorical bans on firearm possession, without exception, are uncommon in our nation's history. For example, it is well established that Catholics could typically carry firearms if they were granted permission by a justice of the peace or swore a loyalty oath to the early nation. *See Bruen* 597 U.S.

at 45 n.12; *Range*, 69 F.4th at 111 (en banc) (Ambro, J., Geenaway, J., and Montgomery Reeves, concurring); *Kanter*, 919 F.3d at 457-58 (Barrett, J., dissenting). Additionally, slaves and Native Americans could typically possess firearms under certain circumstances, usually with permission from their masters or public governing authority. *See United States v. Freeman*, Case No. 23-cr-158, 2023 WL 7325934, *7 (N.D. Ill. Nov. 7, 2023) (slaves could possess firearms with permission from their masters and Native Americans were often not prohibited from possessing a firearm outright); *Prince*, 2023 WL 7220127, *7 (holding same); *see also Heller*, 554 U.S. at 583 n.7 (citing a colonial Virginia regulation that allowed black people and Native Americans living on frontier plantations to obtain a license to carry a firearm). Therefore, section 922(g)(1)'s permanent disarmament of Mr. Edmondson is incongruent with our nation's history of regulating firearms because categorical firearm bans were traditionally subject to meaningful legal exceptions. *See Bruen*, 597 U.S. at 26-27 (holding that "if earlier generations addressed [modern] societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional").

Despite the foregoing, Mr. Edmondson notes that 18 U.S.C. § 921(a)(20) does limit the definition of "conviction" applicable to section 922(g)(1) to exclude those felony offenses which have been "expunged, or set aside" or those held by a person who has been "pardoned or ha[d] [his] civil rights restored[.]" However, section 922(g)(1) still categorically bans all other persons with a qualifying felony conviction from possessing a firearm. Thus, section 921(a)(20) does not provide an exception to section 922(g)(1), but rather narrows the definition for what felonies trigger permanent disarmament. *See Prince*, 2023 WL 7220127, *8 n.5 (holding that a person who fits the definition under section 921(a)(20) "is no longer a felon . . . and, therefore not covered by section 922(g)(1)"); *contra United States v. Johnson*, No. 18-cr-00458, 2023 WL 6690388, *8

(N.D. Ill. Oct. 12, 2023). Accordingly, because section 922(g)(1) contains no meaningful exception to its permanent disarmament of those whom Congress has defined as felons, it "imposes a far greater burden on the right to keep and bear arms than the historical categorical exclusions from the people's Second Amendment right." *Prince*, 2023 WL 7220127 at *8; *see also United States v. Anderson*, Case No. 22-cr-0594, 2023 WL 7531169, *8 (N.D. Ill. Nov. 13, 2023) (dismissing a section 922(g)(1) indictment under *Bruen* in part because "the government ha[d not] met its burden to show a 'distinctly similar,' or even 'relatively similar,' historical analogue to section 922(g)(1)'s <u>permanent</u> prohibition on firearm possession by felons") (emphasis in original).

Moreover, even if this Court considers section 921(a)(20) to be an "exception" to felon disarmament, prosecuting Mr. Edmondson under section 922(g)(1) still violates the Second Amendment as it applies to him because New Hampshire law prohibits him from obtaining the relief necessary to avail himself of section 921(a)(20). "[T]he civil rights that must be restored to trigger the exception [under section 921(a)(20)] are the rights to vote, to hold public office, and to serve on a jury." *United States v. Estrella*, 104 F.3d 3, 5-6 (1st Cir. 1997). Although New Hampshire restores a felon's right to vote and hold public office after a person is released from custody, felons are still prohibited from serving on a jury "unless their conviction[s] have been annulled." *Compare* N.H. Rev. Stat. § 607-A:2; *with* N.H. Rev. Stat. § 500-A:7-a.[9] New Hampshire does not allow the annulment of any felony obstruction of justice charge as a matter of law, which includes the crime of tampering with a witness under N.H. Rev. Stat. § 641:5. *See* N.H. Rev. Stat. §§ 651:5(V), (X)(I)(V)(a).

---

[9]    It should be noted that the New Hampshire legislature repealed a prior version of this law that allowed felons to sit on a jury if their convictions were *eligible* for annulment, after it was held that the previous law restored the right to sit on a New Hampshire jury for the purpose of sections 921(a)(20) and 922(g)(1). *See United States v. Howe*, 106 A.3d 425 (N.H. 2014).

Mr. Edmondson has previously been convicted of felony witness tampering under N.H. Rev. Stat. § 641:5. Therefore, Mr. Edmondson is prohibited from obtaining the annulment necessary to fully restore his civil rights under section 921(a)(20) as a matter of law.

Based on the foregoing, the only avenue through which Mr. Edmondson could legally regain his right to possess a firearm under section 921(a)(20) would be for him to have his witness tampering conviction pardoned by the Governor of New Hampshire—which of course would have to occur in addition to having his remaining felonies annulled and/or pardoned. As an initial matter, it appears that only 3 pardons have been issued in New Hampshire between 1996 and 2020. *See New Hampshire Restoration of Rights & Record Relief*, Restoration of Rights Project, Dec. 29, 2020, available at [https://ccresourcecenter.org/state-restoration-profiles/new-hampshire-restoration-of-rights-pardon-expungement-sealing/](https://ccresourcecenter.org/state-restoration-profiles/new-hampshire-restoration-of-rights-pardon-expungement-sealing/). Moreover, under New Hampshire law, the pardon decision rests exclusively in the state's Executive Branch and is not constrained by even "minimal" due process protections. *See Petition of Smart*, 300 A.3d 953, 957 (N.H. 2023). These legal hurdles functionally deprive Mr. Edmondson any ability to have his civil rights restored under section 921(a)(20). Therefore, section 922(g)(1), as applied to Mr. Edmondson, operates to permanently prohibit him from possessing any handgun, without legal exception.

Considering the legal impediments that prohibit Mr. Edmondson from restoring his firearm rights, *Bruen* should require that the government present a firearm regulation from our nation's history that both permanently prohibited individuals like Mr. Edmondson from possessing all commonly used firearms *and* denied these individuals any ability to seek legal relief from that prohibition. *See Bruen*, 597 U.S. at 26-27 (holding that historical and modern regulations which address a similar social problem "through materially different means . . . could be evidence that [the] modern regulation is unconstitutional"). At a minimum, the government should be required

to show that our nation has traditionally vested the decision of whether to restore an individual's guns rights in a single decision maker, who is unbound by procedural due process. If the government cannot present this specific historical analogue, it cannot properly carry its burden to affirmatively prove that our nation's history and tradition provides sufficient justification for it to prosecute Mr. Edmondson for possessing a common handgun.

The government may also attempt to argue that the nation has a separate history of regulating firearm possession for specific individuals who have committed certain crimes or were otherwise deemed a danger to the public. *See generally Griffin*, 2023 WL 8281564 at *7 (observing that "[t]o soften their disturbing line of argument, the government follows with historical instances where the colonies specifically disarmed free, Christian, white men, whom the authorities believed could not be trusted to obey the law") (quotations and citations omitted). However, the government's response in prior *Bruen* cases, cited *passim*, do not provide a consistent approach to this issue. Thus, Mr. Edmondson is presently unable to address this argument further.

Nevertheless, after presenting its historical record, the government will likely again cite *Bruen* and *Heller* to argue that the Second Amendment historically protects only "law-abiding, responsible citizens" generally. *See Bruen*, 597 U.S. at 26 (citing *Heller*, 554 U.S. at 635). However, as mentioned above, multiple authorities have specifically held that the Supreme Court's prior references to "law-abiding, responsible citizens" was dicta that has not been properly tested against our nation's history. *See generally Range*, 69 F.4th at 102; *Meza-Rodriguez*, 798 F.3d at 669 (holding that it was "reluctant to place more weight on [that] passing reference than the Court itself did"); *Kanter*, 919 F.3d at 453 (Barrett, J., dissenting) (noting a reluctance to consider *Heller's* passing references to law-abiding citizens because "[t]he constitutionality of felon dispossession was not before the Court in *Heller*"); *United States v. Scroggins*, 599 F.3d 433, 451

(5th Cir. 2010) (referring to *Heller's* language regarding felony firearm prohibition as dicta). Indeed, even the majority in *Kanter* noted that "the [Supreme] Court never actually addressed the historical pedigree of felon dispossession laws." *Kanter*, 919 F.3d at 445. Accordingly, dicta from *Bruen* and *Heller* cannot supplant the government's affirmative burden to prove that permanently disarming Mr. Edmondson is actually consistent with our nation's history and tradition of regulating firearms. *See Bruen*, 597 U.S. at 25, n.6 (holding that "in our adversarial system of adjudication, we follow the principle of party presentation" and "[c]ourts are thus entitled to decide a case based on the historical record compiled by the parties") (citations and quotations omitted).

Ultimately, our nation's history of regulating firearms, at most, shows that groups traditionally subject to categorical disarmament were targeted specifically because they posed a danger of armed rebellion—and sources from state ratifying conventions tend to show that categorical disarmament was not favored by the founders unless and until a person engaged in *actual* rebellion. Nevertheless, 18th century regulations typically afforded disarmed groups access to meaningful legal exceptions. Thus, for reasons outlined above, prosecuting Mr. Edmondson for being a felon in possession of a handgun under section 922(g)(1) violates the Second Amendment as it applies to him because it serves to permanently prohibit him, without exception, from possessing the most commonly used firearm for the purpose of armed self-defense.

### 2. Prohibiting Mr. Edmondson from possessing handgun ammunition is inconsistent with the nation's history of regulating firearms.

The Indictment also charges Mr. Edmondson with being a felon in possession of handgun ammunition. (ECF No. 1). However, possessing handgun ammunition is also among the activity presumptively protected by the Second Amendment.

It is well established that the Second Amendment protects ancillary matters necessary for armed self-defense. *See e.g.*, *Bruen*, 597 U.S. at 28 (holding that "even though the Second

Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense." *Heller*, 554 U.S. at 630 (holding that the "requirement that firearms in the home be rendered and kept inoperable at all times . . . makes it impossible for citizens to use them for the core lawful purpose of self-defense and is hence unconstitutional"); *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) (holding that "[a] regulation eliminating a person's ability to obtain or use ammunition could thereby make it impossible to use firearms for their core purpose"); *Ezell v. Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) (holding that the right to possess a firearm implied a corresponding right to access a firing range).

Without ammunition, a handgun would be unable to perform its essential function—fire ammunition in self-defense. Thus, it cannot be reasonably disputed that handgun ammunition is presumptively protected under the Second Amendment because ammunition is strictly necessary for a handgun to perform its essential function. Accordingly, *Bruen* requires that the government also affirmatively prove that permanently prohibiting felons from possessing ammunition is "part of the [nation's] historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S. at 19. However, because the ammunition here is inextricably linked to the handgun itself, the Court need not conduct an independent historical analysis of both items. Indeed, the firearm and ammunition at issue comprise the most commonly used instruments for modern self-defense and should therefore be considered jointly for the purposes of *Bruen*. Because of this, the historical arguments outlined in sections (1)(a) and (1)(b) *supra* apply equally to both firearms and ammunition.

## CONCLUSION

The Indictment charging Mr. Edmondson with being a felon in possession of a handgun and corresponding ammunition under section 922(g)(1) should be dismissed because it attempts

to impose criminal liability on him for conduct protected under the Second Amendment as it applies to him. Permanently prohibiting Mr. Edmondson from possessing any handgun or ammunition, without exception, far exceeds our nation's history and tradition of limited firearm regulations. Accordingly, the Court should dismiss the Indictment pretrial pursuant to Fed. R. Cim. P. 12(b)(1). Mr. Edmondson specifically requests a hearing in this matter.

Respectfully submitted,

Date: January 30, 2024

/s/ Allen Franco
Allen Franco (AR Bar No. 2018197)
55 Sleeper St., 5th Floor
Boston, MA 02210
Tel. (617) 223-8061
Allen_Franco@fd.org

/s/ Jeffrey S. Levin
Jeffrey Levin (NHBA # 12901)
Assistant Federal Public Defender
22 Bridge Street, Box 12
Concord, NH 03301
Tel. (603) 226-7360
Jeff_Levin@fd.org

**CERTIFICATE OF SERVICE**

I hereby certify that on January 30, 2024, the above document was served via CM/ECF to counsel of record, AUSA Charles Rombeau. A copy will be delivered to the defendant.

_/s/ Allen Franco_
Allen Franco